Good morning, Your Honor. My name is Lawrence Siskind. I represent the Plaintiff, Counter-Defendant, and Appellant Babowal & Associates. With me is my associate Seth Appell, who assisted on the briefs. My intention is to reserve five minutes for rebuttal. Eighty-five years ago, Justice Oliver Wendell Holmes, in a trademark case, noted that when a mark is used in such a way that it does not deceive the public, we see no sanctity in the word as to prevent its being used to tell the truth. The trademark is not taboo. The key issue in this case, Your Honor, is whether or not my client will be allowed to tell the truth about an examination that it created to test American English. This examination is based on a format known as the Oxford Arrows format. And in the past, the defendants gave permission to my clients to use the phrases, based on Oxford Arrows examinations, Oxford Arrows U.S. examination, and Oxford Arrows American examinations, to identify and to market and promote this examination. Those three slogans are what are at issue in this appeal. We maintain that we need to use those slogans to tell the public the truth and that they are not taboo. Now, there are many hotly contested issues in this case, but I think the following points are accepted by both sides. Oxford, its name, the crest, the logo, it's a very valuable mark, and it belongs to the defendants. We don't contest that. Oxford Arrows is the name of a format, and we don't believe the defendants contest that. In fact, if you look at their brief, their opening brief, at the bottom of page 5 and going into page 6, they refer to the Oxford Arrows format. If you look at the district court decision in this case, in page 5, line 16, the court also refers to the Oxford Arrows format. We believe there is no dispute that Oxford Arrows is the name of a particular kind of format used in creating tests that test English language proficiency. Mr. Siskin, one of the problems I have with this case, I understand you were not counsel at the time this matter was litigated for the bulk of the district court litigation, but not of the district court litigation. One of the problems I have with what was done by your predecessor counsel is it was kind of a moving target as to exactly what kind of a claim Ms. Babawal was pressing in terms of the protection that she was seeking under the trademark and infringement laws. And I think what I hear you saying now is that the protection really comes in the form of, I guess, what the law calls a nominative use, which is the argument you were just making. But at the beginning of your argument, you made the argument that I thought was being litigated first by predecessor counsel, which was that this really looks like it's endorsed by Oxford, that it's essentially being given almost a license, an imprimatur, if you will, and that it's more than a descriptive term. It's basically, it was being marketed as approved by and with the support of Oxford. And to me, that sounds more like a classic mark that requires a license, which the district court found existed in the form of this letter of intent, which Oxford had the right to revoke or terminate. And if you can help me sort of figure out when the target shifted here and why we shouldn't hold Ms. Babawal to the argument that was made below, that would help me figure out what to do on a piece. I realize it's a long question. No, but it's a helpful one. I'll be glad to do the best I can to respond to it. We can see that arguments made below do represent somewhat of a moving target. And I think the test for this panel today is under Guetta v. United States, whether the arguments that we are making today were raised sufficiently below to give the other side clear notice. And the fact is that fair use, whether classic or nominative, both really depend on the same theme that I quoted from Justice Holmes, use of a trademark to tell the truth. And although scholars may differ on this, I believe that the lines between the two blur. One proof of this is the fact that although, as you noted, Judge Tallman, below our predecessor raised the defense of classic fair use, our opponents responded with rather lengthy analysis in their papers of the two leading Ninth Circuit decisions on nominative fair use, the Playboy case, Terry Wells' case, and New Kids on the Block. Further, the Playboy case itself, the Terry Wells' case, although both sides have cited the Ninth Circuit decision dealing with a summary judgment ruling on that, which is considered a nominative fair use case, the first reported decision on that case, which dealt with the preliminary injunction, which is at 7F sub 2nd 1098. If you read that case, that's actually discussing classic fair use. So you asked a lengthy question. I'm giving you a lengthy answer. My basic point is that by alerting the defendants that we were relying on fair use, we gave them sufficient notice to discern that our argument here is nominative fair use. Is that because you cited New Kids? Is that how you gave them notice? Well, they cited New Kids. And I think that's even more evidentiary because it shows they understood what was really involved here. Is that the basis for notice? Is there citation to a case? Not just the citation, but the discussion of the substance of it, the discussion of Playboy, and the fact, as I said, that the lines between classic fair use and nominative fair use tend to blur. The basic argument behind both is that a party is saying, hey, plaintiff, it's usually the plaintiff rather than the defendants that has the mark, hey, plaintiff, I need to use your mark to tell the public the truth. That is what we have been saying both at the trial court level and at the appeal. Now, we understand the limitations on that defense. Under the New Kids on the block test, we have to show that the product is not readily identifiable without using the mark, that it's reasonably necessary to identify it using the mark, and that we're not suggesting sponsorship or endorsement. And since Judge Tallman brought up the question of sponsorship or endorsement, let me deal with that issue first. Any time a trademark is used under the fair use doctrine, by definition the mark is going to appear. The word Oxford appears. That alone does not suggest, is not sufficient to establish endorsement or sponsorship. Judge Kaczynski discussed this fine line in the New Kids on the block case when he used this example. You can use the word Coke in comparative advertisements. That's fair use. If you used it with the distinctive lettering, the Coca-Cola logo, that would suggest sponsorship. In our appeal, we are not arguing for the right to use the Oxford crest or logo. That's an important distinction. We're only ñ and in fact, we're not even asking to use the word Oxford by itself. We're only asking that the Court recognize our right to tell the public the truth, namely that our Yosemite test is based on Oxford Arrows examinations, or that it is an Oxford Arrows U.S. examination. But doesn't that ñ I mean, it gets us back to the question of whether the issue was properly raised. If it was, I would expect to see in the record factual evidence that would have been adduced by the parties addressing how this particular descriptor was employed by Ms. Babawal and whether it would lead a reasonable consumer of these particular tests or whether it was, as Ms. Babawal insists, merely a description of the format or the kind of test that she was marketing. And I don't see any of that in this record. And of course, the defendants say that's because we didn't know that plaintiff was making a nominative fair use argument. What's your response to that? My response is that the real reason is because defendants decided to move for summary judgment fairly early. There were, I believe, four months left in discovery, and they felt they had a strong enough case to go to the judge, Magistrate Judge Seaborg, at that point and ask for summary judgment. But if that were the case, wouldn't it then be incumbent upon the plaintiff in resisting the summary judgment motion to say, time out, Your Honor, I need more discovery. Here are declarations of what I believe the discovery will show in order to prove to you that there is a disputed factual issue over whether or not consumers might be confused. But that's not the issue here. The issue here, as I understand the point of your questions, is that defendants were prejudiced below because the defendants, their opponents, didn't have the opportunity to adduce the kind of evidence that you're suggesting they might need to report. Or is it that a way to successfully defend against the defendant's summary judgment motion would be to convince the district court that it's inappropriate at this time to grant summary judgment because we're not yet complete with our discovery, and here's what I expect the plaintiff's case will be in order to show that I'm entitled under the Nominative Fair Use Doctrine to utilize the descriptors in the way I wish to use them? Well, I think the key issue on this appeal is whether or not defendants were on notice of the Nominative Fair Use defense and had an opportunity to adduce the kind of evidence they would need to overcome it. I think since they were the ones who chose to bring their motion when they did, before discovery was closed, and in the face of requests from my client that below to the court to have more time to take discovery, I think they're stopped from arguing now that they didn't have a fair opportunity below. I'm having trouble with this in part not only for the reasons already adduced in Judge Tolman's questions, which I agree. I just reread, as we were talking, Judge Seaborg's opinion. You know, and if this were at issue, I would have expected that there would be some hint in his opinion that we were talking about this, and there's nothing. Well, he does talk at length, well, at some length, about the Fair Use defense. Yes, of course. But this Nominative idea is simply not there in his opinion. That's correct. He does not specifically talk about Nominative Fair Use. And I think that what he does talk about is relevant to Nominative. At the very end, he talks about possibility of confusion and sense of endorsement. I mean, to the extent that he does say anything at all, it cuts against your client. But I just don't think the issue was in front of him. I don't think he thought so. It was not in front of him as the term Nominative Fair Use. But the argument that we are trying to tell the truth about our product, that we need to use the word Oxford in doing so, was before him. I go back to my original point, and I hate to belabor it, but the lines between Nominative Fair Use and Classic Fair Use are often murky. That's just the way it is. The Playboy case, as I mentioned before, has two reported decisions. And one discusses Classic Fair Use, the other Nominative Fair Use, and they both are based on the same facts, what this young lady, which was a middle-aged lady by then, was doing with her website. It confuses scholars, it confuses courts, and it confuses litigants. The key is, did the other side know what we were getting at? Did the other side know what our main defense was? I would like to reserve my remaining time for rebuttal. I have a feeling I may need it. Okay. Fine. All right. Thank you. May it please the Court. My name is Michael Wilcox. I am representing the Universities of Oxford and Cambridge. This is a simple dispute over a trademark license agreement. The University of Oxford, in conjunction with the University of Cambridge and through their examination divisions, allowed Babwell & Associates to use their world-famous trademarks in creating and marketing a test of spoken American English in the United States. After only one of these tests was developed, the universities terminated that agreement because Babowal was unable to produce a test that met the standards of the universities. But apparently this one test, the so-called Yosemite test, did meet the standard. The one test, the Yosemite test, did meet the standard. After that, Babowal, despite repeated attempts, could not create another exam that met the standards, and the university rejected all those attempts. And Babowal & Associates are trying to use the mark in connection only with the Yosemite test or with other tests as well? Babowal is now attempting to use the mark with other tests. As I know several of you are instructors, as you probably know, you can't use the same test twice. Oh, I don't know about that. Well, I suppose if enough years have passed, you might, but some of us were fairly good at researching former tests. But regardless, Babowal is attempting to use the university's mark with different tests. Okay. For the first time, Babowal is now arguing that its use was nominative fair use and that the marks were certification marks. Before the district court, Babowal argued that the letter of intent was a partnership agreement and that the universities, therefore, couldn't terminate that agreement. Apparently Babowal, on appeal, has abandoned that argument. Okay. I'd like to turn to just nominative fair use. Now, opposing counsel has stated that the lines between classic fair use and nominative fair use are blurry. Now, in making this argument, are you agreeing that that argument is properly in front of us, or are you making this argument in case we think it is? I am making this argument in case you think it is. I don't believe that this argument is properly in front of you, but I do want to talk about what fair use is so we can talk about what was actually argued in the district court, which was not nominative fair use. Okay. Classic fair use is an infringing use. It's an infringing use that a user might be using a personal name or a geographically descriptive name that is part of someone else's trademark, and that use, infringing use, is deemed fair. Nominative fair use is different. Nominative fair use is not an infringing use because it is a use of another person's trademark that the general public would not see as belonging to the person who is using the trademark. The classic example is if Jim owns an automotive repair shop that repairs Volkswagens and Porsches, if he has a sign that says Jim's Volkswagen and Porsche repair, the general public is never going to think that Jim is the owner of the Volkswagen and Porsche repair, Porsche trademarks. The nature of the use prevents that confusion. Let's take the example he gave of Coke. Now, I've got to get the clerk to remind me. Were you listening to him? He said that it would be like using the word Coke rather than using the Coca-Cola in the style that is trademark. If the use is done in such a way that it is clear that what is being referred to is not Coke, as in you can't use this is Coke, but if it's clear to the public that it's another beverage. It's not a can of pop that says Coke. Oh. Or let's say that it's... If the can said this is like Coke, that would be a nominative fair use. But Coca-Cola, even if it's written in a different style, suggests a Coca-Cola product. Coca-Cola, even if written in a different style, would suggest a Coca-Cola product. That wouldn't necessarily be nominative fair use. Okay. I would like to refer to arguments that were made in the district court to give an example of what was actually argued there. And I'm referring to Excerpt of Record 597, page 12 of Babelwald's summary judgment brief. In concluding a portion of the argument, it states, BNA, which is Babelwald, is the successor or holder in due course of all rights in the Udall Crest and LOGO, and the rights to use the word Oxford Arrels American and Oxford Arrels U.S. Okay. That is not an argument revolving around nominative fair use. That argument is the antithesis of nominative fair use. That argument is saying, I own the trademark, you don't. That was the argument that was at issue before the district court. Okay. Even if this court were to entertain the nominative fair use argument, the factors which appear in the Wells case for nominative fair use are not met. Those factors to begin with, well, one of those factors is only so much of the mark as is reasonably necessary may be used in the nominative fair use. Babelwald in the district court argued that it had a right to use the Latin motto and the university shield and applied for a federal trademark registration of those marks. That does not meet the criteria for nominative fair use. Okay. The product must not be readily identifiable without the use of the trademark. Babelwald did not, first of all, did not present evidence to the district court that the Oxford-Arells classification would be recognizable by the people who purchased the examination. Let me go back, if I could, to sort of ground level. Who's going to take these tests and why? These tests would be taken by foreign language speaking people to determine how well they speak American English. And who's going to administer these tests? Who's going to give these tests to them and then use the results? Well, these examinations would be administered by universities or educational people. And Babelwald makes its money by selling the test to the university that's administering the test? Correct. So it's not like an SAT practice booklet where they're sort of saying, here, practice on this test and you'll do better when you take the real test? I don't. That's not the case, actually. It is sold to the people that are administering the test. And what precisely does Babelwald want to say or have on the test as it's selling the test to the university that wants to administer the test? Well, that's actually a good question. I mean, Babelwald now on appeal states that it would like to use the term based on Oxford Orwell's American examination. In the district court, if you were to look at the amended complaint, the one for declaratory judgment, Babelwald asked that the court declare that it could use three different marks. One of the marks was, quote, Oxford Orwell's American examinations. Another of the marks was, quote, Oxford slash Orwell's U.S. examinations, unquote. And the third mark was, quote, University of Oxford, delicacy of local examinations, dominus illuminatio mea, unquote. That's what was at issue in the district court. So in the district court, Babelwald never said the way I want to identify this test is based upon Oxford Orwell's. That's not perfectly true. The term based on does appear in the summary judgment briefing. It doesn't appear in the complaint. And it appears sporadically through. So it wasn't the kind of focus that appellate counsel has made it here. I misheard. Did you say it did appear in the complaint or did not? It did not appear in the complaint. But it did occasionally, and I don't have an exact number, appear in the summary judgment briefing. As I understand, there was a cease and desist letter that was written by English solicitors at some point,  What was it that she was representing to the entity that received the cease and desist letter? Do you know? I don't know off the top of my head other than I do know that Babelwald was attempting to register trademarks and using the shield. And is this the call coach letter? Yeah, the call coach. Hadn't she tried to market the test to call coach? And when the, when Oxford Cambridge found out, they had their solicitors send a cease and desist letter? Okay. Your Honor, just off the top of my head, I don't know the exact mark that was at issue on the call coach letter. But. Is that because there was no discovery conducted of call coach to find out what it was? I don't believe that there was discovery conducted of call coach. Your Honors, I'd like to move on just for a moment to the certification mark argument. Again, the certification mark argument is a brand new argument on appeal. Babelwald did not mention the term certification mark in any of the briefing. Babelwald did not mention the term certification mark in the oral argument. It was brand new on appeal. You know, the, there are several requirements of a certification mark that prevent these marks from being classified as certification marks. One of which is the owner of a certification mark may not itself use its own mark. It may not market tests or products under that mark. It can allow others to do so. The district court found that the universities had used the marks at issue themselves and had a long history of that use. And Babelwald really doesn't dispute that finding a fact. An owner of a certification mark must allow any user that meets the qualifications that are required under the certification mark to use that mark. That would preclude a certification mark owner from giving an exclusive license. However, the letter of intent states that it's an exclusive license. And Babelwald acted and understood that the letter of intent did that and was exclusive. Okay. Another issue that came up in amongst the certification mark argument was the, whether the letter of intent is a trademark license. Now, this is not an explicit finding of the trial court. The trial court rather implicitly found that the letter of intent was a trademark license based on it finding that the universities were allowed to terminate that agreement and did terminate that agreement. Babelwald argues that it doesn't have certain traits of a trademark license. Babelwald argues that there's no duration, that it doesn't have a clause that states that the mark inures to the benefit of the universities. And the third and most important, Babelwald allegedly, you know, argues that it allegedly does not have a quality control provision. The first two arguments really are not requirements. And if we look at the authority that Babelwald states, those aren't requirements. The third, that the license have a quality control provision is a requirement because otherwise you get a naked license if it doesn't. The letter of intent, which is at Excerpt of Record 56, states that UODL, which is the university appendage that was running this license, will vet and advise on draft examinations. The term vet is a quality control provision, giving the universities the right to review these examinations and reject those that didn't meet the quality standards. And the course of conduct of the parties demonstrates that this is how both of the parties understood this provision to operate. Babelwald provided examinations to the universities. The universities rejected them because they didn't meet quality standards. This was a trademark license. Your Honors, I'd like to talk just briefly about the unfair competition argument. The judge rejected or the judge granted summary judgment on unfair competition for two reasons. First, the pleading around rule. Second, lack of evidence. The pleading around rule states that if a plaintiff may not plead around an absolute bar to relief by recasting a cause of action as one for unfair competition, the cause of action that Babelwald was attempting to plead around was a breach of contract action. The court found that the unfair competition was a recasting of the breach of contract action. Babelwald doesn't dispute that. The breach of contract action failed for lack of proof of damages. Proof of damages is an absolute requirement. We've cited case law on that. That constitutes an absolute bar to relief. Now, Babelwald would argue that it has to be a statutory absolute bar to relief. The Celtech case, which Babelwald cites for that, doesn't really say that. It says it just has to be an absolute bar to relief. In addition, however, the court found that there was a lack of evidence supporting the kind of conduct that is necessary for unfair competition. That conduct would be immoral, unethical, oppressive, and scrupulous or substantially injurious. The only evidence that is cited is the January 1999 letter to Kalkoetsch. That letter contains basically a statement that Babelwald is an infringer. It's a good-faith statement of infringement. This Court in the patent context has stated that a good-faith statement of infringement cannot support an unfair competition argument, and there's no reason that this should not apply in the trademark context. In conclusion, Your Honors, the Court should not consider Babelwald's nominative fair use arguments or certification arguments because those arguments were first brought on appeal. The letter of intent was a trademark license that the universities lawfully terminated. That finding should be affirmed. We also request that this Court overturn the district court attorney's fees determination for reasons we discussed in our briefs. Does the Court have any other questions? Thank you very much. Thank you. Mr. Siskind, you have some time. Thank you, Your Honor. I'd like to return to a question raised by Judge Tallman concerning the letter that was sent to Kalkoetsch. I think it's a very important document in this appeal. That letter is at Excerpts of Record 141, and here is what the defendants told this prospective customer of my client. Babelwald and Associates have no right to use the phrases Oxford Arrows or Arrows or Oxford or Cambridge, since they are all names in which our client has rights of ownership. We have cited, both sides have cited this letter in the discussion of unfair competition, but it's really very relevant to the issues of nominative fair use. The letter shows that the defendants knew that what was at stake here below was the right to use the phrase Oxford Arrows, which I have repeatedly said now is the name of a format. And they have tried to get customers, potential customers of ours, not to do business with us if we use this accurate descriptive term, Oxford Arrows. Why shouldn't we interpret that letter as being consistent with the position that was just argued by Mr. Wilcox that Oxford believed it had a license, it believed it had terminated that license, and now in breach of the former letter agreement, Babelwald was continuing to engage in conduct that previously she might have been permitted to do under the license, but she couldn't do it now, and so a cease and desist letter issued telling the prospective customer she doesn't have the right to do this anymore. Well, that raises two issues. Whether or not they could send a cease and desist letter because of their sincere belief that the license had terminated goes to the unfair competition issue, which I'm going to address in just a moment. But it also goes to the breach of contract issue, doesn't it? Well, on appeal, there is no breach of contract issue. On appeal... No, no, no, but you're suggesting that we should read the letter one way. I'm suggesting to you it's a perfectly plausible way to read it, that it's consistent with the position that Mr. Wilcox just articulated. I'm not disputing that it's consistent with the position he articulated. I'm raising this letter now because it returns us to the nominative fair use issue and whether or not the defendants knew what the issues were below. Okay. So, again, as I believe you ended your argument on an opening, the whole case turns on whether or not we think that your predecessor counsel properly preserved or raised the nominative fair use argument below. Does it not? Well, the whole case on nominative fair use depends on that. If it wasn't raised below properly, we can't raise a new argument on appeal. We have other arguments, though, including the certification mark argument. But I think that this letter shows that both sides knew that whether or not Oxford-Arrows is a term that can be used nominatively was the key issue below and remains the key issue here. I also want to remind the Court that if you look at the record below, what predecessor counsel argued and what the defendants responded to, it was always in terms of fair use, not classic fair use or nominative fair use. Now, I return to my previous statement about the murky distinction between the two. If I were to tell this Court that I am an Oxford graduate, apart from the fact that would be a bald-faced lie, would I be engaging in classic fair use or nominative fair use? Assuming it were true, I could argue that's classic fair use. Under Section 115B of the Lanham Act, you can use a mark in its descriptive sense, including its geographic descriptive sense. And that is what is generally known as classic fair use. But another argument could be I'm really using it as nominative fair use to describe the, to refer to the university and to use their mark to tell the public something about myself. I think in a classroom, in a law school classroom, if that question were posed, probably the students would split evenly on whether it was classic fair use or nominative fair use. So I think notice of the argument and the doctrine was properly provided below. I believe that my colleague has simply misstated the law of pleading around. The argument that we have made is that unless conduct has a safe harbor, it can be attacked under different legal theories. There's no question that telling a potential customer not to deal with a competitor is not sheltered by any safe harbor. We may not have adduced enough evidence to succeed in the breach of contract claim below. That doesn't preclude us from proceeding with an unfair competition claim, which, of course, requires no proof of damages. Thank you, Your Honor. Thank you very much. Thank both sides for very useful arguments in this case. The case of Babblewall and Associates v. University of Cambridge Local Examination Syndicate and so on is now submitted for decision. The last case on our argument calendar this morning is Admiral Insurance v. J. Dale Debrer.
judges: Fletcher, Tallman, Dawson